GENE CLUCK, VIVIAN CLUCK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54527. Filed October 9, 1957.

*Arthur Glover, Esq.*, for the petitioners.
*Paul M. Newton, Esq.*, for the respondent.

## OPINION.

Murdock, *Judge:* The only dispute here is as to the amount of a net operating loss deduction of the petitioner for 1951 resulting from the carryback of a net operating loss for 1952. Secs. 23 and 122, I. R. C. 1939. A net operating loss for 1952 is the excess of the deductions allowed for that year over the gross income with the exceptions, additions, and limitations provided in section 122 (d), which provides in paragraph (5) that "[d]eductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall * * * be allowed only to the extent of the amount of the gross income not derived from such trade or business." The only questions for decision here are whether the deductions for loss on the sale of the breeding-herd animals and on

the sale of a combine were "attributable to the operation of a trade or business regularly carried on" by the petitioner.

The Supreme Court in *Dalton* v. *Bowers*, 287 U. S. 404, was considering the language of an earlier provision identical to that in section 122 (d) (5), and it quoted with approval the following portion of the opinion of the Court of Appeals for the Second Circuit:

> By the statute, allowing the deductions and carrying over the loss for two years, Congress intended to give relief to persons engaged in an established business for losses incurred during a year of depression in order to equalize taxation in the two succeeding and more profitable years. It was not intended to apply to occasional or isolated losses.

Since then other courts have laid down a general rule that a sale of a part or all of the assets used in a trade or business regularly carried on is not attributable to the operation of that business if the sale was connected with the partial or total termination of the regular business rather than with the operation thereof. A Memorandum Opinion of the Court of Appeals for the Ninth Circuit in *Puente* v. *Commissioner*, 199 F. 2d 940, affirming a Memorandum Opinion of the Tax Court dated August 20, 1951, is particularly apropos and is as follows (at p. 940):

> Petitioners seek to set aside an order of the Tax Court denying their claim that a loss sustained by them in the year 1945 on a foreclosure sale of their dairy herd and equipment used by them in the operation of their dairy business in 1944 and 1945 could be carried back to the taxable year under § 122 (d) (5) of the Internal Revenue Code, 26 U. S. C. A. § 122 (d) (5). They concede that the issue presented is substantially the same as that in the following cases which have been decided adversely to the taxpayers: *Lazier* v. *United States*, 8 Cir., 170 F. 2d 521, 9 A. L. R. 2d 324; *Sic* v. *Commissioner*, 8 Cir., 177 F. 2d 469, certiorari denied 339 U. S. 913, 70 S. Ct. 572, 94 L. Ed. 1339; *Merrill* v. *Commissioner*, 2 Cir., 173 F. 2d 310; *Baruch* v. *Commissioner*, 2 Cir., 178 F. 2d 402; *Pettit* v. *Commissioner*, 5 Cir., 175 F. 2d 195; and *Smith* v. *United States*, 6 Cir., 180 F. 2d 357.
>
> Petitioners have presented reasons why they think those cases were wrongly decided. We have considered with care the petitioners' arguments. They do not persuade us. In our judgment the decisions cited were required by the terms of the section referred to.
>
> The decision of the Tax Court is affirmed.

The court, in the *Lazier* case, said (170 F. 2d 521, 526):

> One reasonably may believe that in providing for the carrying forward and carrying back of "net operating losses," Congress was concerned with "net operating losses" sustained in the normal operation of a business regularly carried on by a taxpayer and was not concerned with losses attributable to the total or partial liquidation of the physical properties used in the conduct of the business. * * *

The other opinions cited in the *Puente* case are to the same effect. See also *Bratton* v. *United States*, 230 F. 2d 952, involving a lumberman who sold his mill at a loss; *Joe B. Luton*, 18 T. C. 1153, appeal

dismissed (C. A. 4); *Jay Burns*, 21 T. C. 857, reversed on other grounds 219 F. 2d 128; and see also *Helen Goble*, 23 T. C. 593, in which this whole subject was discussed and the above line of cases distinguished on the ground that the sales by Helen Goble in the regular course of her business did not materially reduce the scope of activities or materially change its nature or the manner in which it was conducted.

It is not necessary to decide here whether the petitioner's activities in connection with the breeding herd, the commercial herd, and the wheat-farming operations constituted one single business or three separate businesses, because in any event the losses from the sales here in question of the 250 cattle in 1952 are attributable to the partial liquidation, at least, of one important part of that business.

The contentions of the petitioner's counsel that the breeding animals were changed into a part of the commercial-herd activity of the petitioner when he decided to fatten them and sell them, is not supported by the petitioner's testimony, by his books of account and returns, or by decided cases. He regarded the activities as separate at all stages and so indicated in his testimony, records, and returns. The cases hold that breeding-herd animals continue to be breeding-herd animals until sold under such circumstances. *O'Neill* v. *United States*, an unreported case (44 A. F. T. R. 931, 52–2 U. S. T. C. Par. 9462, S. D. Cal. 1952), affirmed per curiam 211 F. 2d 701; *Fawn Lake Ranch Co.*, 12 T. C. 1139; *Albright* v. *United States*, 173 F. 2d 339; *Franklin Flato*, 14 T. C. 1241, affirmed on another issue 195 F. 2d 580; *Charles E. Reithmeyer*, 26 T. C. 804. See also Regulations 118, section 39.117 (j)–2 (*b*), providing that a breeding animal disposed of within a reasonable time after its intended use for such purpose is prevented by accident, disease, or other circumstance is still regarded as an animal held for breeding purposes.

The Commissioner did not err with respect to the loss on the sale of the 250 breeding cattle in 1952. However, he erred in disallowing the loss on the sale of the combine as an operating loss, since that loss was purely incidental to the farming business and did not result in any substantial diminution of that business.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

FISHER, *J.*, dissenting: Petitioner, during 1951 and part of 1952, had a breeding herd which he maintained as a separate function of his business, the other functions being farming and the purchase and sale of so-called commercial cattle. Bang's disease was diagnosed in his breeding herd. It then became futile for petitioner

either to attempt to continue the herd as a breeding herd, or to replace it as such, because he knew that the disease would remain in the grass or pasture from 8 to 10 years. No doubt petitioner could have liquidated by sale, substantially as a group, the animals which had comprised the breeding herd. In fact, however, he treated them the same as his commercial cattle, which, in my opinion, he had every right to do. In other words, he fattened up the animals, kept them the period necessary for such purpose, and then sold them from time to time, in due course, to packers, which was the same procedure he followed with his so-called commercial cattle. Bang's disease was diagnosed in February. Most of the sales of the cattle in question did not occur until October and November of 1952. Forty-two of the animals were still on hand at the end of 1952. It is true that the breeding function terminated (as a result of an operational catastrophe) but to my mind, upon the record, the sale of the 250 animals which had been part of the breeding herd was not made as a part of the termination of petitioner's cattle-breeding activity. Upon such termination, the animals were fattened and made available for sale as a part of the commercial cattle function, increasing, *pro tanto*, the number of animals on hand for that purpose. The so-called commercial cattle function of the business had existed prior to, and continued uninterruptedly during and subsequent to, the breeding function. The holding, fattening, and sale of the cattle which had been in the breeding herd became a part of the existing business of dealing commercially in cattle and was part of a business operation which was regularly carried on. It is my judgment, therefore, that, upon a consideration of all of the facts in proper perspective, the loss on the sale of the cattle was in every realistic and practical sense an operating loss which did not come under the exceptions and limitations of section 122 (d) (5).

The majority Opinion cites numerous cases, including those referred to in *Puente* v. *Commissioner*, 199 F. 2d 940 (C. A. 9), with all of which I fully agree. My difficulty with them is that, to my mind, they do not fit the facts in the record in the instant case. The authorities which hold that the exceptions and limitations of section 122 (d) (5) are applicable arose under circumstances differing widely from those here presented, as will appear from the following discussion.

In *Puente* v. *Commissioner*, *supra*, the loss arose out of a foreclosure sale of a dairy herd and equipment—obviously not an operational loss.

In *Lazier* v. *United States*, 170 F. 2d 521 (C. A. 8), petitioner operated a farm and marketed his products. The loss arose out of the sale of a farm and equipment. He was not engaged in the real estate business or buying and selling farm machinery.

In *Sic* v. *Commissioner*, 177 F. 2d 469 (C. A. 8), certiorari denied 339 U. S. 913, there was an isolated sale of a farm by a farmer not engaged in the business of selling farms.

In *Merrill* v. *Commissioner*, 173 F. 2d 310 (C. A. 2), the loss arose out of the sale of a partnership interest by one not engaged in the business of selling such interests.

In *Joe B. Luton*, 18 T. C. 1153, the loss occurred upon sale of restaurant equipment after petitioner ceased to operate the restaurant. There is no suggestion in the case that petitioner was in the business of selling restaurant equipment.

In *Jay Burns*, 21 T. C. 857, petitioner sustained a loss from the sale of an office building which he had constructed, and had used for about 20 years in his business of renting office and business space to tenants. The disposition of the building was an isolated sale.

In *Helen Goble*, 23 T. C. 593, the claimed net operating loss was allowed. The facts, however, differ materially from those before us, and I find no basis for reliance upon the case either by me or by the majority.

The distinction between the facts in the cases relied upon by the majority and the facts in the instant case may perhaps be highlighted in summary by reference to *Pettit* v. *Commissioner*, 175 F. 2d 195 (C. A. 5, 1949), affirming a Memorandum Opinion of this Court, dated June 10, 1948, in which the Court of Appeals said, in part (p. 195):

There is room for doubt growing out of intricate provisions of the statute and the history of this and precedent legislation and former regulations; but we think this loss was not incurred in the operation of a trade or business, and so not an operating loss at all. The business had been abandoned. The plant was sold not in operating the business, but because the business was not to be operated any more.

In my judgment, the foregoing language of the Court of Appeals (which recognized difficulty even under the facts there presented) plainly exposes the difference between the controlling factors which produced the results there reached and the significant factors in the case before us. Here, petitioner had three phases of his business. It is true that one operational phase or function ceased of necessity as a result of an operational catastrophe, but the cattle theretofore devoted to such function were readily transferable to, and became a practical part of, another operational function. Although at one time part of the former function, such cattle were held, fattened, and disposed of in the ordinary course as part of the latter. I think this is quite different from the circumstances in *Pettit*, *supra*, where taxpayer sold land and equipment which had previously constituted the business plant used in operating an orange grove which, however, was

no longer in operation. There is no suggestion that, prior to sale, the land and equipment were (or could have been) transferred to another existing operating function or business owned by the same taxpayer.

The majority Opinion points to the fact that petitioner's books and records, and his income tax return for 1952, dealt with the breeding cattle separately from the commercial cattle. Respondent, however, does not question the amount of the loss, and points to no reason why petitioner should not have continued with his existing method of keeping books and records. While the keeping of separate records is a fact properly to be taken into consideration, to my mind, viewed in the light of all of the circumstances of the case, it is by no means determinative of the issue before us. The same view may be expressed with respect to the fact that depreciation was taken. (See discussion in *Fawn Lake Ranch Co.*, 12 T. C. 1139, 1144, re significance, *vel non*, under section 117 (j), of including breeding cattle in inventory.) As above suggested, the amount of the loss is not in question. The only issue is whether the loss may be taken into account in determining net operating loss for carryback purposes. Finally, the majority reaches the conclusion that "breeding-herd animals continue to be breeding-herd animals until sold under such circumstances." The first case cited in support of this view is *O'Neill* v. *United States*, an unreported case (44 A. F. T. R. 931, 52–2 U. S. T. C. Par. 9462, S. D. Cal. 1952), affirmed per curiam 211 F. 2d 701. Examination of the opinion of the District Court discloses the following statement:

XI. Whether the 194 heifers sold during 1943 were held for breeding purposes is a question of fact, and it is determined that they were held * * * for breeding purposes within the meaning of Section 117 (j) * * *

The Court of Appeals, affirming, held that the finding was not clearly erroneous and was supported by substantial evidence. In my judgment, neither opinion requires the conclusion that, under the circumstances of the instant case, "breeding-herd animals continue to be breeding-herd animals until sold." It is of significance, also, that the issue in *O'Neill*, *supra*, related to the application of section 117 (j), the question being whether gains were entitled to capital gains treatment under that section, and not whether (as in the instant case) losses were subject to the exceptions and limitations of section 122 (d) (5) in determining net operating losses for carryback purposes. It is my own view that if the sales had resulted in net losses, the court would have held on the same facts that the exceptions and limitations contained in section 122 (d) (5) did not apply since, although the cattle involved in *O'Neill*, *supra*, were not held primarily for sale in the ordinary course of business, they were held as part of the operation of

a business regularly carried on. *A fortiori*, such a conclusion would have followed if they had been held primarily for sale in the ordinary course of business.

The majority Opinion also cites *Fawn Lake Ranch Co.*, 12 T. C. 1139; *Albright* v. *United States*, 173 F. 2d 339; *Franklin Flato*, 14 T. C. 1241; and *Charles E. Reithmeyer*, 26 T. C. 804. Each of these cases involve issues arising under section 117 (j) ; all are, in my opinion, distinguishable upon the facts; and when applied to the facts in the instant case, in the setting of an issue arising under section 122 (d) (5), fail to support the propositions for which they are urged. In *Fawn Lake Ranch Co.* and *Albright*, it would again appear, for the reasons stated in discussing *O'Neill*, *supra*, that if the sales had resulted in net losses, instead of gains, the holding would have been that the exceptions and limitations of section 122 (d) (5) did not apply. In *Flato*, petitioner decided to sell his ranch and all cattle (including breeding stock) except a few which he transferred to a newly acquired ranch. Upon the facts, the Court reached the obvious conclusion that the sale of the breeding stock was "analogous to the liquidation of a business." In *Reithmeyer*, petitioners, in the sand and gravel business, sold mined-out land for building sites. The Court held that certain lots in platted areas were held primarily for sale in the ordinary course of business while other parcels outside of the platted area were not. It does not appear to me that the Opinion is helpful in disposing of the issue in the instant case.

The majority also refer to Regulations 118, section 39.117 (j)–2 (b), providing in substance that a breeding animal disposed of within a reasonable time after its intended use for such purpose is prevented by accident, disease, or other circumstance, is still regarded as an animal held for breeding purposes. The regulation is, of course, an implementation of section 117 (j), and not section 122 (d) (5) where the objectives, conditions, and limitations differ. Read in the light of either section, however, it is not applicable, in my opinion, to the sale, mainly in October and November, as part of a commercial cattle operation, of cattle which had been a part of a breeding herd operation which had terminated in February.

It is my view, on the basis of the foregoing discussion, that the loss sustained on the sale, as commercial cattle, of the animals which had originally been part of the breeding herd must be taken into consideration as a factor in determining petitioner's net operating loss in 1952 for carryback purposes.

I agree with the majority on the issue relating to the sale of the combine.

PIERCE, MULRONEY, and TRAIN, *JJ.*, agree with this dissent.